# EXHIBIT 7

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LYNN TILTON and PATRIARCH PARTNERS
XV, LLC,

                     Plaintiffs,

                  v.

MBIA INC. and MBIA INSURANCE
CORPORATION,

                     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index No. 68880/2015
Hon. Alan D. Scheinkman
Commercial Division

**AMENDED COMPLAINT**

Plaintiffs Lynn Tilton and Patriarch Partners XV, LLC ("Patriarch XV")

(collectively, "Plaintiffs"), by and through their undersigned counsel, for their Amended

Complaint against defendants MBIA Inc. and MBIA Insurance Corporation ("MBIA Insurance")

(collectively, "MBIA"), allege, upon personal knowledge as to themselves and their own acts and

upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This action involves three investment funds: Zohar CDO 2003-1 ("Zohar I"),

Zohar II 2005-1 ("Zohar II"), and Zohar III, Limited ("Zohar III") (collectively, the "Zohar

Funds").  As MBIA has been aware of many years, the Zohar Funds are managed by certain

affiliates of Ms. Tilton, including Patriarch XV, Patriarch Partners XIV, LLC, Patriarch Partners

VIII, LLC ("Patriarch VIII"), and Patriarch Partners, LLC ("Patriarch Partners") (collectively,

"Patriarch").  Patriarch's business model is to invest, through managed investment funds, in

senior secured loans originated for deeply distressed companies (the "Portfolio Companies") and

to effect turnarounds for those companies.  The Patriarch-managed investment funds are

structured as collateralized loan obligations ("CLOs").  These CLOs, including the Zohar Funds,

issued notes to raise the capital necessary to fund the loans to the Portfolio Companies and thereby support the turnarounds.

2.      This action arises out of MBIA's fraudulent scheme to induce Plaintiffs to spend more than $103 million to buy out a third-party noteholder in Zohar I. MBIA told Patriarch that it was interested in extending the maturity date of Zohar I and pursuing a consensual restructuring of the Zohar Funds, goals MBIA knew were shared by Patriarch. However, MBIA viewed the third-party noteholder as, in its own word, an "impediment" to these plans and its own economic position in the Zohar Funds.

3.      Unbeknownst to Patriarch, MBIA had ulterior motives. It was eager to remove this impediment, not to cooperate with Patriarch, but to improve its own negotiating position. In order to induce Plaintiffs to buy the notes and thereby remove the impediment, MBIA repeatedly lied to Plaintiffs and made false promises regarding its consent to extend the Zohar I maturity. After Plaintiffs purchased the notes, MBIA and Patriarch controlled all of the consent rights needed to extend the Zohar I maturity. Yet, to Plaintiffs' great surprise, after they spent over $103 million to purchase the notes, MBIA refused to consent to the extension.

* * * *

4.      MBIA Insurance is a monoline insurer. It has insured hundreds of billions of dollars in structured financial products, including about $180 million in Zohar I notes and $1 billion in Zohar II notes.

5.      Ms. Tilton and/or certain of her affiliates hold substantial equity stakes in, and Ms. Tilton serves as the Manager or the Board of the Portfolio Companies, which include iconic American manufacturing companies with tens of thousands of employees. As explained below, the three Zohar Funds invest in many of the same companies and loans.

6.     Shortly after the last of the three Zohar Funds, Zohar III, was created, the United States experienced a widespread financial crisis.  The financial crisis hit the Portfolio Companies hard and, as a result, the turnarounds did not happen as quickly as had been anticipated.  By 2012, it became apparent that additional time beyond the November 20, 2015 stated maturity date of Zohar I was going to be needed to create sufficient value for the Zohar Funds to repay the outstanding notes.

7.     For the Zohar Funds to pay off the notes, Ms. Tilton and her affiliates would need to continue their efforts to turn around the Portfolio Companies and strategically sell them at attractive prices.  The necessary value could not be created by conducting fire sale liquidations of the Zohar Funds that would destroy the Portfolio Companies and put their tens of thousands of employees in jeopardy.

8.     Patriarch believed, and informed MBIA, that the Zohar I and Zohar II notes could likely be paid off, or the deals restructured to maximize value, by the scheduled January, 2017 maturity date for Zohar II.

9.     During the three year period from 2012 to March 2015 (when MBIA's fraud was revealed), Patriarch was exploring numerous paths toward a consensual, negotiated resolution, including repurchasing or restructuring the notes issued by the Zohar Funds.  At the same time, Ms. Tilton and her affiliates worked tirelessly to turn around, build value and prepare the Portfolio Companies for sale to maximize value in the Zohar Funds.

10.    However, all of the proposals under consideration would require an extension of the Zohar I maturity to provide time for the parties to negotiate a restructuring and, if necessary, to raise any additional funds needed to repurchase notes or fund the restructuring plans.  Because the Zohar Funds invest in the same Portfolio Companies and loans, extending the Zohar I

3

maturity would allow the common collateral to be managed for the benefit of all the Zohar Funds' noteholders and would minimize the ability of individual noteholders to use consent rights or to take other actions in their own self-interest that would jeopardize the Portfolio Companies and the interests of other noteholders.

11.     Accordingly, Patriarch initiated discussions as early as 2012 with MBIA and other investors regarding an extension of the Zohar I maturity from November 20, 2015, to January 20, 2017 (Zohar II's maturity date) and an associated global restructuring of all three Zohar Funds.

12.     During the three year period from 2012 to March 2015, Ms. Tilton, on behalf of Patriarch, was in constant discussions with MBIA to design and devise a restructuring plan that would be in the best interests of all constituencies, including MBIA and the Zohar noteholders.

13.     Throughout these discussions, MBIA repeatedly assured Patriarch—and the public—that its interests were aligned with Patriarch's and that it favored a global restructuring, which would protect its positions in both Zohar I and Zohar II.  MBIA also repeatedly acknowledged that extending the Zohar I maturity was a necessary first step toward a restructuring.

14.     Throughout the course of its discussions with Patriarch, MBIA never said it was seeking to avoid or defer its obligation to pay on the Zohar I policies. MBIA's obligation to pay the Zohar I insured notes was "unconditional[] and irrevocabl[e]." Thus, it was a foregone conclusion that, by the stated November 20, 2015 maturity of Zohar I, MBIA would have to either (i) pay on the Zohar I policies; (ii) buy the Zohar I insured notes it did not already own; or (iii) pay the noteholders substantial consideration in exchange for the noteholders' agreement to extend the maturity date of the notes.  Indeed, MBIA repeatedly acknowledged to Ms. Tilton and Patriarch its obligation to "take care of" the insured Zohar I noteholders.

15.     By 2012, Ms. Tilton and Patriarch's principal point of contact at MBIA was Anthony McKiernan, MBIA Inc.'s Executive Vice President and Chief Portfolio Officer and MBIA Insurance Corp.'s Managing Director and Chief Risk Officer.  MBIA brought McKiernan in to manage its day-to-day relationship with Patriarch and the Zohar Funds.  McKiernan regularly met and spoke with Patriarch, including frequent one-on-one meetings and calls with Ms. Tilton in which they discussed in detail potential plans to extend the Zohar I maturity and restructure the Zohar Funds.

16.     Over time McKiernan carefully and meticulously sought to gain Ms. Tilton's and Patriarch's trust, repeatedly telling them that MBIA's interests were aligned with Patriarch's, that it had an economic incentive to extend Zohar I and to achieve a global restructuring, and that it was prepared to do so.

17.     Because MBIA Insurance was the so-called Controlling Party for both Zohar I and Zohar II, and the party with the largest exposure in those funds, Patriarch understood that it required MBIA's cooperation in connection with any restructuring plans.  Thus, Patriarch and Ms. Tilton expended substantial time, effort and resources in order to keep MBIA apprised of its restructuring efforts.  Among other things, Patriarch prepared a data room for MBIA's advisors and responded to the best of its abilities to innumerable requests for information that MBIA claimed were necessary to evaluate a restructuring of the Zohar Funds.  For her part, Ms. Tilton regularly engaged in calls, meetings and other communications with McKiernan during which they discussed potential restructuring plans.  She also engaged in countless meetings and calls with lawyers, financial advisors, Zohar noteholders and other investors to discuss restructuring plans and to raise capital to fund the plans.

18.     In undertaking these substantial efforts, which would have been futile if MBIA refused to extend the Zohar I maturity, Plaintiffs reasonably believed MBIA's representations that it was committed to extending the Zohar I maturity in order to facilitate a restructuring. Indeed, without a global restructuring, MBIA Insurance might have to pay claims not only on the Zohar I notes but also on approximately $800 million of Zohar II notes.

19.     Potential exposure on Zohar II was a serious concern for MBIA.  In fact, in early March 2015, Moody's Investors Service, Inc. ("Moody's") threatened to downgrade MBIA's insurance financial strength rating due to its concerns that if MBIA could not reach a restructuring of the Zohar Funds prior to the Zohar I maturity, the risk of a Zohar II default would increase and MBIA would be vulnerable to stress, including insolvency, as a result of the payments it would have to make.  Thus, MBIA sought to protect itself from its substantial Zohar II exposure.

20.     While MBIA and Plaintiffs' interests were ostensibly aligned, such was not the case with the prior holder of the Zohar I Class A-3 Notes (the "A-3 Noteholder").  The A-3 Noteholder's consent was necessary for any extension or restructuring of Zohar I.  MBIA specifically told Plaintiffs that the A-3 Noteholder was an "impediment" to their plans; the A-3 Noteholder was unlikely to agree to an extension or restructuring of Zohar I because it did not own any of the Zohar II notes and its interests were thus not aligned with MBIA's and Patriarch's.

21.     MBIA repeatedly assured Plaintiffs, however, that it would consent to extend the Zohar I maturity if the A-3 Noteholder were removed as an "impediment," leaving just MBIA and Patriarch in full control of Zohar I, paving the way to a global restructuring of the Zohar Funds.

6

22.     Indeed, once the A-3 Noteholder impediment was removed, it was within MBIA's power to obtain all necessary consents to an extension of the Zohar I maturity.  An extension required the consent of all affected Zohar I noteholders.  However, only the A-3 Noteholder, Patriarch and MBIA controlled the consent rights regarding an extension.  A Patriarch affiliate owns the Class B Notes.  MBIA Inc. owns the Class A-2 Notes.  And, because it insured timely payment of principal and interest of the Class A-1 and Class A-2 Notes, MBIA Insurance controlled those notes.

23.     As set forth in the governing indenture, in the event of a payment default on the Zohar I notes that it insured, MBIA Insurance is required to make the payments to investors on the CLO's behalf.  Once the notes are paid using insurance proceeds, MBIA Insurance assumes all of the investors' rights under the indenture, including the right to consent to an extension of the maturity date or to waive defaults.  Thus, once MBIA Insurance paid on its policy (and it was certain it would be called upon to do so, given the financial condition of Zohar I and the timing of amortizations), the Class A-1 Noteholder could do nothing to prevent MBIA from obtaining the consent rights associated with the Class A-1 Notes.

24.     By March 2015, there was still no restructuring plan in place and the Zohar I maturity was only months away.  Plaintiffs learned that the A-3 Noteholder intended to sell its notes.  By purchasing the notes, Plaintiffs could remove the impediment to extending the Zohar I maturity.  Therefore, in reliance upon MBIA's representations, promises and agreement, Plaintiffs notified MBIA that it would buy the notes and then did so—for over $103 million.

25.     Only days after Plaintiffs bought the Class A-3 Notes, however, MBIA reneged on its agreement and refused to consent to the extension of Zohar I.  As it turned out, MBIA's conduct over the past three years has been an elaborate ruse.  MBIA never intended to consent to

an extension.  Instead, it dangled the extension carrot because it wanted to induce Plaintiffs to use their own money to remove the "impediment".  Once the impediment was removed, MBIA intended to use the threat of a Zohar I default as a means to obtain additional leverage over Plaintiffs in connection with any restructure of Zohar I and Zohar II.  It has now become obvious that MBIA's extensive efforts to convince Plaintiffs that their interests were aligned was all a pretext and that MBIA is completely indifferent to the plight of the Zohar noteholders, Plaintiffs' interests or to whether its conduct ultimately destroys the Portfolio Companies.

26.     MBIA's conduct after Plaintiffs bought the Class A-3 Notes confirms that it never intended to honor its promise and agreement.  Once Plaintiffs purchased the Class A-3 Notes, the veto power over a Zohar I extension and a global restructuring once belonging to the A-3 Noteholder was effectively transferred to MBIA (by virtue of its ownership of the Class A-2 Notes and its unconditional obligation to pay all principal and interest to the Class A-1 Noteholder in the event of default).  Using its newfound power, obtained by fraud, MBIA announced that a Zohar I extension was off the table until a global restructuring was agreed to on terms that MBIA desired and could dictate.

27.     Indeed, after it duped Plaintiffs into buying the Class A-3 Notes, MBIA told Moody's that it believed allowing Zohar I to default at its November 20, 2015 maturity would be good for MBIA, because it would gain rights and authority over the notes under the Indenture and thereby put it in a better position to negotiate to avoid losses on both Zohar I and II.

28.     With no extension in place, Zohar I matured on November 20, 2015 to the detriment of the investors in Zohar II and Zohar III, the Portfolio Companies and Plaintiffs.

29.     In order to protect its interest in Zohar I and its affiliates' interests in the Zohar Funds and the Portfolio Companies from MBIA's conduct, Patriarch XV filed an involuntary bankruptcy petition with respect to Zohar I on November 22, 2015.

30.     MBIA's conduct has caused Plaintiffs substantial damages.

31.     By this action, Plaintiffs seek to recover for losses incurred as a result of MBIA's breach of contract, breach of promise and fraud in connection with its scheme to trick Plaintiffs into buying the Class A-3 Notes.

## PARTIES

32.     Plaintiff Ms. Tilton is a natural person and a citizen and resident of Florida.

33.     Plaintiff Patriarch XV is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in New York County, New York.  Patriarch XV is majority-owned, through affiliated entities, by Ms. Tilton.  Patriarch XV is a registered investment advisor and the collateral manager of Zohar III.

34.     Defendant MBIA Inc. is a publicly traded holding company with its executive offices in Purchase, Westchester County, New York.  Together with its subsidiaries, MBIA Inc. operates one of the largest financial guaranty insurers in the United States and is a provider of asset management advisory services.  Shares of MBIA Inc. common stock are traded on the New York Stock Exchange.

35.     Defendant MBIA Insurance is incorporated in New York and has its executive offices in Purchase, Westchester County, New York.  MBIA Insurance is a wholly-owned subsidiary of MBIA Inc. and primarily operates MBIA Inc.'s structured finance and international insurance business.  In 2008 and 2009, MBIA Inc. effectively designated MBIA Insurance as a

9

"bad bank" by diverting substantial MBIA Insurance resources to another, healthier affiliate and causing MBIA Insurance to stop writing new structured finance policies.

## BACKGROUND

### I.    PATRIARCH AND THE ZOHAR FUNDS

#### A.    The Firm

36.    Ms. Tilton founded Patriarch Partners in 2000 and is its CEO.  Patriarch Partners is devoted to rebuilding America one company at a time, one job at a time.  Patriarch Partners and its affiliated entities focus on the acquisition (through managed investment funds) and invigoration of undervalued, iconic American brands where time, capital and sound strategy can rescue a business and restore value, creating and preserving jobs in America.  These brands are comprised primarily of domestic manufacturing companies that produce goods "made in the U.S.A.," including a defense contractor that supplies major military hardware (e.g., helicopters) to the U.S. and foreign militaries.  Ms. Tilton is the Manager (or Board of Directors) and, in some cases, the CEO, of approximately 70 of these companies.  Ms. Tilton's platform is one of the largest woman-owned businesses in the United States.

37.    Ms. Tilton operates the businesses associated with Patriarch through numerous affiliated entities.  This has been well known to MBIA for at least a decade.  Among other things, as explained below, in 2003, MBIA hired separate Patriarch-affiliated entities to manage certain CDOs it insured.

#### B.    The Zohar Funds

38.    A CLO is a special purpose vehicle that issues notes or other securities to investors in exchange for cash.  The CLO uses the cash to invest in loans that, in turn, generate

10

cash flows to pay back the CLO's investors over time with interest. The collateral manager of a CLO selects and manages the investments.

39.     The Zohar Funds are CLOs and have issued notes to investors and made loans to the Portfolio Companies. Patriarch affiliates (including Ms. Tilton) are the equity owners and/or collateral managers of the Zohar Funds. In addition, Ms. Tilton has invested in certain of the Zohar I Portfolio Companies in the aggregate amount of over $218 million.

40.     Patriarch's principal investment strategy, unique among CLO collateral managers, is to make loans to distressed companies, obtain equity in the same and implement a long-term turnaround strategy to build value for the funds and their noteholders. As part of the strategy, the Zohar Funds have invested more than $2.5 billion raised from the Zohar Fund noteholders in the debt of distressed companies. Patriarch, through the CLOs it manages, invests in businesses that others have abandoned and turns them around.

41.     Zohar I, Zohar II and Zohar III hold substantially overlapping investments in various Portfolio Companies, meaning that events impacting Zohar I could affect the value of the holdings of Zohar II and Zohar III. For example, for a given portfolio company, the Zohar Funds lend collectively, with each Zohar Fund holding a participation interest in a loan to the portfolio company. If Zohar I were liquidated and forced to sell its collateral, the purchaser of an interest in a particular loan could block maturity extensions and restructurings of that loan, thus interfering with Patriarch's ability to manage flexibly the underlying loans' repayment terms.

42.     As described below, MBIA played a significant role in the creation of the Zohar Funds and has always known that the Funds' success depends on Patriarch's ability to manage flexibly the underlying loans' repayment terms.

43.     Thus, MBIA has at all times known that any adverse actions it takes against Zohar I could impair the value of the collateral of loans in Zohar II and Zohar III.

**C.     The Zohar I Noteholders**

44.     Zohar I issued four classes of notes pursuant to its Indenture:  Class A-1 notes, Class A-2 notes, Class A-3 Notes and Class B notes.

45.     Under a Financial Guarantee Insurance Policy dated November 13, 2003, MBIA Insurance insured the Class A-1 and Class A-2 notes for the full amount of principal and accrued interest due and owing in the event that Zohar I failed to pay noteholders.

46.     MBIA Insurance insured the Zohar II Class A-1 and A-2 Notes under substantially similar policies.

47.     Under a separate Supplemental Financial Guarantee Insurance Policy also dated November 13, 2003, MBIA Insurance insured the Class A-3 Notes.  However, at some point, upon information and belief, prior to 2012, MBIA Insurance and the A-3 Noteholder agreed to cancel the Class A-3 policy.

48.     As shown in figures 1-3, set out in paragraphs 55 below, as of February 2015, a fund controlled by an institutional investor (the "A-1 Noteholder") owned the Class A-1 Notes; MBIA Inc. owned the Class A-2 Notes; the A-3 Noteholder owned the Class A-3 Notes; and a Patriarch-affiliate owned the Class B Notes.

**D.     MBIA's Control Over The Zohar Funds**

49.     As insurer of the Class A-1 and Class A-2 Notes, MBIA Insurance is designated the Credit Enhancer under the Zohar I Indenture. As Credit Enhancer, MBIA Insurance is also deemed the "Controlling Party" so long as it has not failed to pay an insurance claim and has not become the subject of a bankruptcy proceeding.

50.     As Controlling Party, MBIA Insurance holds substantial power to determine the course of the fund both before and after default.  Among other things, the Controlling Party has the right to direct the Zohar I trustee to pursue or to discontinue any remedies available to the trustee.  This could include directing the trustee to take, or to cease taking, action against one of the Portfolio Companies on a loan held by Zohar I.  Under § 5.13 of the Indenture, upon default of the Zohar I notes, the Controlling Party has the power to direct the trustee to foreclose upon the Zohar I collateral.

51.     Section 8.2 of the Zohar I Indenture further provides that to extend the maturity or to make changes that would affect the payment, timing or amount of principal and interest on the notes, the consents of the Controlling Party as well as "each Holder of each Outstanding Note of each Class adversely affected" by the amendment are required.

52.     However, once MBIA Insurance's insurance obligations are triggered and it makes a payment under the Insurance and Indemnity Agreement, it becomes subrogated to the noteholders' rights to the extent of that payment under Section 16.5 of the Indenture.  In light of the fact that MBIA paid all of the outstanding principal and accrued but unpaid interest, if any, on the stated maturity date of the Class A-1 and Class A-2 Notes in November of 2015, it is now fully subrogated to all payment and voting rights of those notes.  It has effectively become the holder of the insured notes for all relevant purposes.

53.     When MBIA Insurance pays any outstanding principal or interest of the Class A-1 Notes or Class A-2 Notes, Zohar I is not relieved of any payment obligations; it simply owes the principal and interest to MBIA Insurance.

54.     Under the definition of "Outstanding" under the Indenture, until MBIA Insurance's subrogation rights are satisfied (through repayment by Zohar I of the amounts paid

13

by MBIA Insurance on its insurance), the Class A-1 and Class A-2 Notes remain "Outstanding"

under the Indenture and MBIA Insurance is deemed to be the "Holder" of those notes:

> To the extent that the Class A-1 Notes or the Class A-2 Notes have been paid with proceeds of the Credit Enhancement [i.e., the MBIA insurance] . . . such Notes shall continue to remain Outstanding for purposes of this Indenture until the Credit Enhancer [MBIA Insurance] has been paid as subrogee hereunder (and (without duplication) has been paid all outstanding Credit Enhancement Premium and Supplemental Credit Enhancement Premium and all outstanding Credit Enhancement Liabilities and Supplemental Credit Enhancement Liabilities), and the Credit Enhancer shall be deemed the Holder thereof, to the extent of any payments thereon made by the Credit Enhancer.

55.    The following three figures illustrate the ownership and related consent rights of

the parties with interests in Zohar I:

**Figure 1 - Ownership and Control of Zohar I Notes Before March 26, 2015**

| Class | Original Notional Amount | Beneficial Owner | Consent and Control Rights |
|---|---|---|---|
| Class A-1 | $150,000,000 | A fund managed by the A-1 Noteholder | • Controlled by MBIA Insurance.<br>• As Insurer/Controlling Party, MBIA Insurance deemed the Holder for most purposes, including for voting or giving consents or waivers. *Indenture § 16.1(b).*<br>• Prior to insurance payments, owner's consent needed to change maturity date and certain other fundamental terms ("Fundamental Changes"). *Indenture § 16.1(b).*<br>• If notes are paid with insurance proceeds, MBIA Insurance is subrogated to payment rights and deemed the Holder for all purposes, including consent to Fundamental Changes. *Indenture, definition of "Outstanding" & §8.2.* |
| Class A-2 | $32,000,000 | MBIA, Inc. | • MBIA Inc. has same rights as MBIA Insurance Class A-1 Notes.<br>• MBIA Inc. controlled all rights |
| Class A-3 | $350,000,000 | A-3 Noteholder | • After MBIA Insurance policy commuted, A-3 Noteholder controlled all rights. |
| Class B | $150,000,000 | Octaluna, LLC (a Patriarch affiliate) | • Patriarch controlled all rights. |
| Preference Shares | 19,999 shares | Octaluna, LLC | • Patriarch controlled all rights. |

Figure 2 - Ownership and Control of Zohar I Notes After March 26, 2015

| Class | Notional Amount | Beneficial Owner | Consent and Control Rights |
|---|---|---|---|
| Class A-1 | $150,000,000 | A fund managed by the A-1 Noteholder | • Same – Controlled by MBIA Insurance. |
| Class A-2 | $32,000,000 | MBIA, Inc. | • Same – Controlled by MBIA Inc. |
| Class A-3 | $350,000,000 | Patriarch XV | • Same – Patriarch controlled all rights. |
| Class B | $150,000,000 | Octaluna, LLC | • Same – Patriarch controlled all rights. |
| Preference | 19,999 shares | Octaluna, LLC | • Same – Patriarch controlled all rights. |

Figure 3 - Ownership and Control of Zohar I Notes After November 20, 2015

| Class | Notional Amount | Beneficial Owner | Consent and Control Rights |
|---|---|---|---|
| Class A–1 | $150,000,000 | MBIA, as subrogee | • Same – Controlled by MBIA Insurance. |
| Class A–2 | $32,000,000 | MBIA, as subrogee | • Same – Controlled by MBIA Inc. |
| Class A–3 | $350,000,000 | Patriarch XV | • Same – Patriarch controlled all rights. |
| Class B | $150,000,000 | Octaluna, LLC | • Same – Patriarch controlled all rights. |
| Preference | 19,999 shares | Octaluna, LLC | • Same – Patriarch controlled all rights. |

## II.   MBIA'S RELATIONSHIP WITH PATRIARCH

56.   MBIA Inc.'s historical business principally has been the underwriting of financial guaranty insurance and other forms of credit protection to customers worldwide.  MBIA Insurance is a wholly-owned subsidiary of MBIA Inc. and the world's largest "monoline" insurer. MBIA Insurance wrote financial guaranty policies covering a variety of structured finance securities, including notes issued by CLOs.  Under a CLO insurance policy, MBIA Insurance guaranteed the scheduled payments of interest on each interest payment date and principal at stated maturity to noteholders in the event of a payment default by the CLO issuer.  In other words, if the issuer could not pay back noteholders, MBIA Insurance would.  As compensation for its insurance, MBIA Insurance was paid a premium by the CLO issuer.

## A.   MBIA Enlists Patriarch Partners' Help

57.   Between 1996 and 2002, MBIA and/or its affiliates issued insurance policies and/or surety bonds with respect to certain senior notes issued by seven collateralized debt obligation ("CDO") issuers (the "MBIA Funds").

15

58.     In 2002, MBIA faced an enormous insurance exposure and expected financial shortfall of between $91 million and $297 million with respect to financial guaranty insurance policies it held covering the senior notes issued by the MBIA Funds.  By April 2003, MBIA had determined that its loss reserves could only cover approximately $10 million of the expected shortfalls of the underperforming MBIA Funds.

59.     To remediate the troubled MBIA Funds that threatened to cause severe financial distress to MBIA, MBIA turned to Ms. Tilton and Patriarch Partners.  Neither Ms. Tilton nor Patriarch Partners had any prior involvement with the MBIA Funds.  At all times MBIA understood that Ms. Tilton would operate through affiliates, which is the common industry practice, rather than in her personal capacity.[1]  In April 2003, Patriarch Partners and certain affiliates agreed to assume the role of manager of the MBIA Funds in order to effect a turnaround of the otherwise failing CDOs and to mitigate any potential losses to MBIA.  In return, MBIA Insurance was to provide financial guaranty insurance on the senior classes of notes of a new CLO to be created and managed by Patriarch, Zohar I.  Thus, the Zohar I transaction originated as a Patriarch solution to an MBIA problem.  By the terms of their agreements, MBIA promised to pay the Zohar I Class A-1 and Class A-2 noteholders the principal and interest due to them in the event that Zohar I defaulted and could not make the payments.  MBIA Insurance insured over $180 million of Zohar I's class A-1 and A-2 notes.

---

[1] For example, MBIA was aware that the Z-1 CDO 1996 Ltd. fund would be managed by Patriarch Partners V, LLC; the Ceres II Finance  Ltd. fund by Patriarch Partners, IX, LLC; the Aeries Finance II Ltd. fund by Patriarch Partners X, LLC; the Amara-1 Finance Ltd. fund by Patriarch Partners XI, LLC; the Amara-2 Finance Ltd. fund by Patriarch Partners XII, LLC; the Oasis Collateralized High Income Portfolio I, Ltd. fund by Patriarch Partners XIII, LLC; and the Captiva CBO 1997-1, Ltd. fund by Patriarch Partners VII, LLC; all of which were managed and ultimately owned by Ms. Tilton.

60.     In 2004, Patriarch Partners began work on a new CLO, Zohar II, which would invest alongside Zohar I.  In January 2005, Zohar II issued $1 billion in funded, senior notes—almost twice as much as Zohar I had issued.  MBIA Insurance insured $1 billion of the Zohar II Class A Notes, in addition to the $180 million in insured Zohar I Class A-1 and Class A-2 Notes. In April 2007, Patriarch Partners created another CLO fund, Zohar III, containing collateral overlapping with Zohar I and Zohar II.  MBIA Insurance did not insure Zohar III.

**B.     MBIA Becomes Distressed**

61.     In 2007, there were growing concerns about the health of the real estate markets, the risks of certain financial products (including those linked to real estate) and MBIA Insurance's potential liabilities to its structured-finance policy holders.  In the summer of 2007, the housing bubble burst and caused capital markets, including the market for structured products, to freeze.  The financial markets continued to deteriorate during 2008, at least in part because of concerns about financial institutions' and insurers' exposure to structured-finance obligations.

62.     In 2008 and 2009, Moody's and S&P downgraded MBIA Insurance's credit rating in a series of reports, noting their opinions that MBIA Insurance would "face diminished public finance and structured finance new business flow and declining financial flexibility," that continuing deterioration in the structured-finance markets would place pressure on MBIA Insurance's capital adequacy, and that there was an "expectation of greater losses on [MBIA Insurance's] mortgage related exposure."  The market for CDOs shut down and MBIA Insurance stopped issuing insurance on structured products altogether.

**C.     MBIA's Suit Over Zohar I Fails**

63.     In April 2009, MBIA Insurance filed suit against two Patriarch affiliates in the United States District Court for the Southern District of New York, captioned *MBIA Insurance*

*Corporation v. Patriarch Partners VIII, et ano.*, 09 Civ. 3255 (RWS), alleging that they had breached agreements entered into among MBIA Insurance and the Patriarch affiliates regarding Zohar I and the MBIA Funds' remediation plan. MBIA Insurance alleged that under the agreements, Patriarch VIII was obligated to seek a rating for the Zohar I Class B Notes and to subsequently contribute the notes to the MBIA Funds. Recognizing the potential value in Zohar I, MBIA Insurance sought to obtain $180 million in cash, the value it placed on the Class B Notes, which were subordinate to the senior notes MBIA Insurance insured, in order to help rescue itself from its impending financial losses stemming from the MBIA Funds. In response, the two Patriarch affiliates argued that the Zohar I Class B Notes were never able to be rated such that they were required to be contributed.

64.     Following a fourteen-day bench trial, on June 10, 2013, the Honorable Robert W. Sweet rejected MBIA Insurance 's claims and ruled in favor of the Patriarch affiliates. *See MBIA Insurance Corp. v. Patriarch Partners VIII, LLC, et ano.*, 950 F. Supp. 2d 568 (S.D.N.Y. 2013).

## III.   PATRIARCH'S EFFORTS TO OBTAIN A GLOBAL RESTRUCTURING OF THE ZOHAR FUNDS

65.     The financial crisis hit the Portfolio Companies hard. Some of the Portfolio Companies could not pay full interest on the loans they had obtained from the Zohar Funds and turnarounds became difficult to achieve. Bank lending for small- and mid-sized companies could not be accessed, making refinancing unlikely. Moreover, many banks were enforcing any rights they had to call loans that were out of compliance with loan covenants. The merger and acquisition market all but dried up, making exiting sales at appropriate prices impossible to achieve. As a result, amortization on the Zohar I notes has been slow and Zohar I's ability to repay the notes upon maturity has been jeopardized.

66.     Section 2.2 of the Zohar I Indenture provides that the Zohar I notes were scheduled to mature on November 20, 2015.  On this date, noteholders were due all principal and accrued but unpaid interest from Zohar I and MBIA Insurance was obligated to pay the outstanding principal and interest to the insured noteholders to the extent that Zohar I was unable to do so.

67.     In late July 2012, Ms. Tilton reached out to the A-1 Noteholder to discuss the Zohar Funds and a possible restructure.  The A-1 Noteholder was interested in providing services and its support to facilitate an overall restructure.  As the A-1 Noteholder held notes in both Zohar I and II, it expressed an interest and willingness to extend the Zohar I maturity to match the Zohar II maturity.  During this time period there was substantial concern among the Zohar I and II noteholders regarding the value of MBIA Insurance's insurance policies (known as a "wrap"), as it was unclear whether MBIA would have the ability to make full payment in the event of a default.  The A-1 Noteholder  advised Ms. Tilton that preserving the value of the underlying assets of the funds and successful monetization of those assets was important to them.

68.     On October 5, 2012, Patriarch called a meeting with all Zohar I noteholders, including the A-3 Noteholder and MBIA.  At the meeting, Patriarch explained that amortization would be slow and value would take time to rebuild.  Patriarch proposed extending the maturity date of the Zohar I notes.  For an extension, all noteholders would have to consent.  In response to the proposal, McKiernan, an executive of both MBIA Inc. and MBIA Insurance, expressed MBIA's significant interest in extending the maturity of Zohar I to January 2017, to match the maturity date of Zohar II.

69.     An extension of the Zohar I maturity date had several strategic benefits that Patriarch shared with MBIA.  Among other things, the collateral loans held by Zohar I and Zohar

19

II could be managed more effectively for the benefit of all the Zohar Funds if the maturity of Zohar I were extended.  Aligning the maturities of Zohar I and Zohar II would avoid a situation in which the Portfolio Companies might be subject to disparate treatment by the different Zohar Funds.  Many of the Portfolio Companies could be sold, but to unlock their full value, the companies had to be sold in the normal course of business in a competitive sales process.  This takes time and must be effectuated without the shadow of defaults or "firesale" conditions.

70.     In contrast, if Zohar I were in a prolonged state of default, the businesses of the Portfolio Companies might be adversely affected and the prices paid for the companies substantially reduced.  As noted below, the rating agency Moody's opined in March and October 2013 that if Zohar I defaulted at its original maturity, the likelihood of a Zohar II default in 2017 would increase.  During the ongoing discussions, MBIA made it clear that it understood the need to maximize value in the Portfolio Companies and to sell them under the best possible conditions.  Indeed, such an approach would be in the best interests of all of the Zohar Funds' constituents, including MBIA.

71.     Based on MBIA's statements at the October 5, 2012 meeting, and in subsequent meetings and calls, it appeared that MBIA's stated interest in extending the Zohar I maturity was to take the necessary first step to facilitate a global restructuring of the Zohar Funds.  MBIA was not seeking to avoid its payment obligations on the Class A-1 Notes.  Indeed, because MBIA had "unconditionally and irrevocably" guaranteed payment of the Class A-1 Notes and the Class A-2 Notes, while it could conceivably have avoided paying itself on the Class A-2 Notes it owned, it could not avoid its obligations to the A-1 Noteholder.  Thus, McKiernan repeatedly stated that MBIA Insurance would "take care of" the A-1 Noteholder in order to facilitate the extension, leaving the A-3 Noteholder as the only impediment to an extension.

72.     On March 8, 2013, MBIA and Patriarch arranged a conference call to discuss the possible terms of an extension.  McKiernan provided to Patriarch the terms under which MBIA would consent to an extension of the Zohar I maturity.  It was agreed that Patriarch would draft a term sheet based on MBIA's terms to present to the Zohar I noteholders, including the A-3 Noteholder.  During this conversation, McKiernan told Tilton that MBIA viewed the A-3 Noteholder as an "impediment" to getting the extension done, because the A-3 Noteholder had not invested in Zohar II or Zohar III and thus had a different time horizon and different interests.  MBIA, on the other hand, had over $800 million in exposure to Zohar II (*i.e.*, more than five times its exposure to Zohar I), and therefore wanted an extension.  McKiernan made clear to Patriarch that MBIA would consent to an extension of Zohar I if Patriarch was somehow able to remove what MBIA viewed as the "impediment" that the A-3 Noteholder presented.  If the A-3 Noteholder "impediment" were removed, MBIA had the ability to obtain all necessary consents to an extension and a restructuring.

73.     Also on March 8, 2013, Ms. Tilton reached out to the A-1 Noteholder to discuss progress on a potential extension and restructuring.

74.     On or about March 15, 2013, Patriarch presented to MBIA and the A-3 Noteholder a term sheet proposing the terms for an extension of Zohar I's maturity from November 2015 to January 2017.  This proposal was the result of the negotiations between Patriarch and many of the terms on the term sheet were included at MBIA's insistence.  For the following five months, though, MBIA ceased responding to Patriarch's repeated attempts to move the Zohar I extension discussions forward.

75.     In August 2013, MBIA told Patriarch that it was going to meet with the A-3 Noteholder directly about an extension, but no agreement from the A-3 Noteholder was obtained.

Between March 2013 and October 2013, MBIA repeatedly stated to Patriarch that it was the A-3 Noteholder that was the impediment (and the only impediment) to an extension of the Zohar I maturity and that if that impediment were removed, MBIA would consent to an extension.

76.     In October 2013, Patriarch retained Moelis & Company ("Moelis") to assist with a possible restructuring of all three Zohar Funds in order to increase the value and performance of the funds.  Patriarch and MBIA recognized that a Zohar I maturity extension could both provide additional time for Zohar I to avoid a default and simultaneously facilitate a future restructuring of the Zohar Funds.  The first step for MBIA, as stated, was to extend the maturity date of Zohar I so as to make the Zohar I and II maturities coterminous.

77.     Through the end of 2013 and into 2015, Patriarch, MBIA and Moelis continued to discuss an overall restructuring of the Zohar Funds and engaged in unsuccessful efforts to win the support of the A-3 Noteholder with respect to a Zohar I maturity extension.  Over this period, MBIA repeatedly asserted that the A-3 Noteholder was the "impediment" to an extension.

78.     During this period, McKiernan also met monthly and had near weekly telephone calls with Ms. Tilton, during which they discussed in detail potential plans for extending Zohar I and restructuring the Zohar Funds.  McKiernan consistently expressed that MBIA's interests were aligned with Patriarch's and that it shared a common goal of achieving a global restructuring.  It is now apparent that this was a ruse and just a part of McKiernan's overall strategy to gain Ms. Tilton's trust and to convince her that MBIA had put the prior litigation behind it and that it was committed to achieving shared goals.

79.     Patriarch also expended substantial time and extensive resources to satisfy numerous requests from MBIA and its advisors for information MBIA claimed necessary to evaluate a global restructure.  This included setting up a data room for MBIA's advisors and

responding as best Patriarch could, consistent with its obligations, to countless information requests from MBIA.

80.     During this time, McKiernan repeatedly urged Ms. Tilton to communicate with him in person or by telephone, rather than through email, whenever possible.  Plaintiffs now believe this request was made not out of some concern for confidentiality but rather to avoid leaving a paper trail of McKiernan's misrepresentations.

81.     In August 2014, Patriarch received a proposal from an outside lender to finance the restructuring of the Zohar Funds.  Patriarch had been in constant and continued discussions through this period to discuss the Zohar Funds' restructuring.  Patriarch presented the term sheet for this proposal to MBIA for its consideration.

82.     By September 8, 2014, Moelis had engaged with MBIA directly in order to negotiate the terms of the overall restructuring, in addition to the Zohar I extension.  Among other things, during this period in late 2014, the parties discussed the need for MBIA to contribute, along with Patriarch, to any repurchase of the Class A-3 Notes (or other notes issued by the Zohar Funds) that might be necessary to facilitate a restructuring, given that the A-3 Noteholder impediment still existed.

83.     On or about February 11, 2015, Patriarch and its advisors and MBIA and its advisors scheduled a meeting to discuss the upcoming maturity date of Zohar I and the then-current state of negotiations, regarding both an extension of the Zohar I maturity date and a restructuring of the Zohar Funds.  Despite Patriarch's efforts, no real progress had been made towards MBIA's financial participation in the repurchase of the Class A-3 Notes or a Zohar I extension and there was an impending maturity date with no agreement to extend.

84.     In email correspondence between Ms. Tilton and McKiernan on February 11, 2015, Ms. Tilton stressed the significance of the upcoming meeting, noting that "[n]othing is more important to me than to move forward on what is best for the funds."

85.     On February 17, 2015, the meeting was held at Patriarch's offices in lower Manhattan.  Among others, Ms. Tilton from Patriarch and McKiernan from MBIA participated.

86.     McKiernan reiterated that a Zohar I extension would avoid a default and be the first step in a full restructuring of Zohar I and II because the extension would align the maturity dates of Zohar I and Zohar II and hence allow for more time for the parties to work out complex details that would avoid a situation where Portfolio Companies were faced with disparate treatment between Zohar I and Zohar II.  McKiernan also reiterated that MBIA would "take care" of the A-1 Noteholder.

87.     On March 3, 2015, the pressure on MBIA to reach a global restructuring of the Zohar Funds intensified when Moody's announced that it had put MBIA's Insurance's financial strength rating on "negative" outlook.  Moody's stated that its actions "reflect the heightened risk in the Zohar I and II CLO notes that MBIA Corp. insures" and that "absent a successful remediation, these exposures could result in meaningful strain on [MBIA Insurance's] capital and liquidity profiles."

88.     Moody's further commented that "MBIA [Insurance's] exposure to the first Zohar CLO, maturing in November 2015, is manageable, however failure to reach a global settlement on all Zohar deals would expose MBIA Corp to meaningful claim payments and losses on the much larger Zohar II CLO, that matures in 2017."  Significantly, Moody's urged MBIA to resolve the situation *before* Zohar I matured in November 2015.  Moody's warned of the "[i]ncreased potential for significant liquidity and capital strain in the event of a failure to

restructure the Zohar CLOs on terms that significantly reduce MBIA [Insurance's] potential for loss, ahead of the November 2015 maturity of the Zohar I CLO."

## IV.   The A-3 Notes Purchase

89.     On March 19, 2015, the A-3 Noteholder emailed Patriarch's restructuring advisor Moelis to notify them that the A-3 Noteholder intended to sell all of its Zohar I notes in an auction the following week.  Ms. Tilton was interested in buying the notes, through one of her affiliates if necessary, to remove what MBIA had long identified as the impediment to a Zohar I extension.

90.     On March 21, 2015, Ms. Tilton emailed McKiernan notifying him that the A-3 Noteholder was going to sell at auction and that she was "considering a bid."  On March 23, 2015, Ms. Tilton again emailed McKiernan, this time to follow-up on the extension and restructuring initiatives discussed at the February 17 meeting (which included MBIA's agreement that if the A-3 Noteholder impediment were removed, MBIA would agree to an extension of the Zohar I note maturity).

91.     On March 23, 2015, the A-3 Noteholder notified Moelis that Ms. Tilton would need to trade through an intermediary that had an open trading account on the A-3 Noteholder's trading system because a new account could not be opened in the three days before bids were due.

92.     On March 25, 2015, the day before bids were due, the A-3 Noteholder in email expressed skepticism that Patriarch would be able to participate in the auction due to the trading account issues.  Patriarch was unsure if it would be able to participate.

93.     Also on March 25, 2015, McKiernan responded to Ms. Tilton by email that "MBIA remains intent on continuing the process established on February 17 working with our

25

respective advisors to resolve the Zohar issues."  That process necessarily included MBIA's commitment to an extension of the maturity date of Zohar I if the "impediment" was removed, and Ms. Tilton understood McKiernan's response that way.

94.     On March 26, 2015, less than an hour before bids were due, the A-3 Noteholder notified Ms. Tilton and Moelis that the trading account issue could be resolved if Patriarch XV were used as a vehicle for the purchase.  Patriarch XV had a closed account with the A-3 Noteholder, which could be re-opened expeditiously since Patriarch XV was an SEC-registered advisor.

95.     In reliance on McKiernan's and MBIA's prior repeated representations over the course of more than three years, Ms. Tilton, through her affiliate Patriarch XV, submitted a bid to purchase the Class A-3 Notes.  The A-3 Noteholder rejected the initial bid at 11:44 A.M. and replied at 2:47 P.M. with a counteroffer for $103,919,863.34 that required Ms. Tilton to analyze and respond to within hours.  Ms. Tilton accepted the counteroffer at 4:57 P.M.

96.     Ms. Tilton funded Patriarch XV's purchase of the Class A-3 Notes.  The amount paid for the notes took into account their value with an extension and restructuring and the increase to the value of Zohar II and Zohar III that such extension and restructuring would represent.

**V.     MBIA Reneges on Its Agreement with Patriarch**

97.     Within days, though, MBIA reneged.

98.     As it turns out, MBIA's representations regarding the A-3 Noteholder were false. MBIA never intended to consent to an extension unless it could extract onerous and substantial concessions from Tilton and Patriarch in an overall restructuring of the Zohar Funds.  MBIA

tricked Plaintiffs into purchasing the notes by fraudulently representing that MBIA would consent to an extension if the impediment presented by the A-3 Noteholder was removed.

99.     Following a conversation on April 13, 2015, Patriarch sent a letter to MBIA's counsel expressing Patriarch's "surprise to learn . . . that MBIA is not interested in extending Zohar I without a concurrent restructure of Zohar II" given that "McKiernan had long stated that [the A-3 Noteholder] was the impediment to extending the maturity of Zohar I."  By letter dated April 19, 2015, Ms. Tilton again reminded MBIA of its commitment, stating that "Anthony McKiernan had long stated that [the A-3 Noteholder] was the impediment to extending the maturity of Zohar I."

100.     In a letter on MBIA Inc. letterhead dated April 21, 2015, MBIA Inc. CEO Jay Brown wrote to Ms. Tilton, admitting that he and MBIA Inc. were "indeed aware of your transaction with [the A-3 Noteholder]" and that "Anthony [McKiernan] keeps me and the entire senior team well informed on all aspects of our exposure to Zohar I and II."  Brown continued that "[McKiernan] will provide a more substantive response to your letter later today."

101.     As this letter demonstrates, during his negotiations with Patriarch regarding the Zohar I extension, McKiernan was acting in his capacity as executive of MBIA Inc. (as a Zohar Fund investor) and MBIA Insurance (as insurer of the Zohar I Class A-1 and Class A-2 Notes and the Zohar II Class A-1 and Class A-2 Notes), and working at the direction of Brown and "the entire senior team" at MBIA Inc.  McKiernan's promises and representations regarding MBIA's agreement to extend the maturity of Zohar I were made on behalf of both MBIA Inc. and MBIA Insurance.

102.     In a letter later that same day, McKiernan re-confirmed that MBIA had reneged on the commitment it had affirmed at the February 17 meeting.  McKiernan wrote to Ms. Tilton

that, "[r]egarding Zohar I, we have no basis to determine whether an extension is in MBIA's best interest.  To make that assessment, we need, among other things, full and unfettered access to information regarding the collateral and the borrowers."

103.    This information demand was a pretext.  Providing such information had never before been a pre-condition for MBIA's consent to a Zohar I extension and, in any event, substantial information had previously been provided by Patriarch to MBIA on multiple occasions over many years.

104.    Most incredibly, MBIA not only rejected its agreement to consent and take necessary steps to extend Zohar I upon the purchase of the Class A-3 Notes by Patriarch, but also has since denied that MBIA had ever received any restructuring proposals regarding the Zohar Funds.  On August 5, 2015, Edward Chaplin, CAO and CFO of MBIA Inc., stated on an earnings call that, "while we believe that a global negotiated solution that would refinance or restructure the Zohar's CDO is in the best interest of all parties, *a proposal to that end has not materialized at this point . . . .*"  This statement is directly contradicted by the extension and restructuring proposals presented to MBIA by Patriarch throughout 2013 and 2014, as described above.

105.    MBIA has apparently confirmed its true strategy with Moody's.  On October 9, 2015, Moody's issued another report on MBIA, which continued to express concern that there was a risk to MBIA that Zohar II would default if an overall restructuring could not be reached before the Zohar I maturity.  Moody's report reveals, however, that MBIA was seeking to convince the rating agency that a Zohar I maturity would actually be a <u>positive</u> development for MBIA:

> If the Zohar I CLO notes are not restructured ahead of their November 20, 2015 maturity, it is likely that they will default, and MBIA Corp. will make a claim payment of all or part of the $151 million in principle due at maturity. *A default would trigger MBIA's gaining certain rights and authority over the notes, which*

28

*would see them in a better position to take steps to mitigate their losses on a potential default of both the Zohar I and II CLOs ($151 million and $808 million in principal at June 30, 2015, respectively).* However, we believe that the inability to reach agreement on a favorable restructuring ahead of the Zohar I CLO maturity increases the risk of a default on the Zohar II CLO notes in 2017. (Emphasis added).

106.    In addition, according to a November 23, 2015 report by BTIG (an equity analyst that followed MBIA), MBIA Inc.'s President and CFO told an investment analyst, "If we are required to pay a claim [on Zohar I], we think paying a claim will give us additional leverage to move the entire process toward a consensual restructuring prior to the maturity of Zohar II."

107.    Despite MBIA's failure to adhere to its commitment at the February 17 meeting, Patriarch continued its extensive—and, to date, fruitless—effort to effect an extension of Zohar I and a global restructuring.  MBIA, by contrast, has refused to agree to reasonable terms to a global restructuring despite numerous proposals presented by Patriarch.

A.    **Plaintiffs' Reliance on MBIA's False Promises and Representations Was Reasonable**

108.    Patriarch and Ms. Tilton worked for three years to devise a global restructuring of the Zohar Funds.  Patriarch and Ms. Tilton believed that extending Zohar I's maturity to be coterminous with Zohar II's was the necessary first step to a global restructuring regardless of the restructuring's other details, and was repeatedly led by MBIA to believe that it shared that view.  Over those three years, McKiernan regularly assured Ms. Tilton that only the A-3 Noteholder impeded a maturity extension and that MBIA would consent to an extension if the A-3 Noteholder impediment was removed.

109.    Ms. Tilton reasonably trusted McKiernan, a top executive at a public company, when he regularly assured her, including during the parties' meeting on February 17, 2015, that MBIA would consent to an extension and that an extension and global restructuring of the Zohar Funds was in MBIA's best interest.  In fact, in an email dated March 25, 2015, McKiernan

assured Ms. Tilton after MBIA was made aware of Ms. Tilton's intent to purchase the A-3 Notes that MBIA was "intent on continuing the process established on February 17," which included an extension of Zohar I once Patriarch removed the A-3 Noteholder.

110. Considering MBIA's years' worth of assurances that an extension and global restructuring were in its best interest, Ms. Tilton (and, through her, Patriarch XV) reasonably relied on MBIA's repeated assertions that the A-3 Noteholder alone impeded a deal. Other than MBIA, Patriarch and the A-3 Noteholder, there were no other interested parties that could block an otherwise agreed-upon extension.

111. The Class B Notes were owned by a Patriarch affiliate controlled by Ms. Tilton, which at all times stood ready and willing to consent to an extension.

112. The Class A-2 Notes were owned by MBIA Inc., and insured by MBIA Insurance, so MBIA was in a position to provide any necessary consents under the Class A-2 Notes.

113. The Class A-1 Notes were owned by a fund controlled by the A-1 Noteholder, but MBIA at all relevant times had the ability, and, if needed, the right to obtain the A-1 Noteholder's consent. As explained above, MBIA had an unconditional and irrevocable obligation to pay the A-1 Noteholder at the original maturity date of Zohar I. Thus, MBIA repeatedly advised Patriarch that it would "take care of" the A-1 Noteholder in order to clear the way for an extension. MBIA had several options. It could have purchased the Class A-1 Notes before the maturity.

114. Indeed, throughout Ms. Tilton's efforts to restructure Zohar I, the A-1 Noteholder indicated that it would be willing to sell its notes to MBIA *at a discount*. In particular, the global head of structured products at the A-1 Noteholder assured Ms. Tilton that the A-1 Noteholder would agree to an extension if it were guaranteed payment in full at the original stated maturity

*or* paid a discount to par prior to the original stated maturity.  The global head of structured products had full decision-making authority with respect to the A-1 Noteholder's Zohar Fund positions.  Moreover, the A-1 Noteholder assured Ms. Tilton as early as March 1, 2013 that the A-1 Noteholder would support her in a restructuring.  In short, the A-1 Noteholder was not an impediment to an extension and any assertion by MBIA that it was would be misleading.

115.    Even if the A-1 Noteholder had decided to act against its economic interests and refuse to sell its notes to MBIA or otherwise try to be an impediment, it could not have succeeded in blocking an extension.  If all else failed, by the November 20, 2015 maturity date, the Financial Guaranty Insurance Policy No. 42712 dated November 13, 2003 required MBIA Insurance to deposit sufficient funds with the Zohar I trustee to pay off the Class A-1 Notes.  As soon as MBIA Insurance made that payment, and the notes were paid using insurance proceeds, MBIA Insurance would become subrogated to all rights of payment under, and would inherit all of the consent rights of, the Class A-1 Notes.  (Section 4.05 of the Insurance and Indemnity Agreement dated November 12, 2003 between MBIA and Zohar I;  Section 16.5(b) and the definition of "Outstanding" under the Zohar I Indenture)  At that point, only MBIA's and Patriarch's consents would be needed to extend the Zohar I maturity, waive any defaults or otherwise amend the Indenture.

116.    Indeed, that is what occurred: on November 20, 2015, Zohar I defaulted on its maturity, MBIA Insurance paid insurance on the Class A-1 Notes and assumed all rights under the Class A-1 Notes.  Thus as of November 20, 2015, MBIA holds all of the consent rights formerly held by the A-1 Noteholder and is the only party other than Patriarch whose consent is needed for an extension.  MBIA is now the only impediment.

117.    Therefore, it was always reasonable for Plaintiffs to rely on MBIA's assurances that with the A-3 Noteholder out of the way, it would and *could* agree to an extension.

118.    No amount of sophistication could have uncovered MBIA's misrepresentations. MBIA represented that if Ms. Tilton removed the A-3 Noteholder impediment, MBIA would consent to a Zohar I extension.  It was MBIA's secret intent not to consent to an extension in the event that Ms. Tilton purchased the Class A-3 Notes, and no amount of due diligence could have uncovered that secret intent.

**B.    MBIA's Actions Have Injured Plaintiffs**

119.    At the time MBIA made its misrepresentations to Ms. Tilton, it was acutely aware that she held a number of interests in the Zohar Funds and Portfolio Companies.  Among other things, Ms. Tilton's affiliates were investors in and/or collateral managers for each of the Zohar Funds and equity holders and lenders to a number of the Portfolio Companies that were borrowers on loans held by the Zohar Funds.  MBIA knew or could foresee that its fraudulent acts, false promises and contract breaches would impact Ms. Tilton's various interests and that she would take actions in reliance on MBIA's statements and promises to protect those interests.

120.    MBIA was also aware that Ms. Tilton operated her businesses through affiliated companies.  MBIA knew this from, among other things, its prior dealings with Patriarch as collateral manager for ten CLOs it insured.  When MBIA sought to hire Ms. Tilton to rescue the MBIA Funds in the early 2000s, it engaged separate affiliates of hers to act as managers of the funds.  During the Preliminary Conference with this Court on December 10, 2015, counsel for MBIA conceded that Ms. Tilton operated through various affiliated entities.  MBIA therefore knew or could foresee that in relying on MBIA's statements and promises, Ms. Tilton would act not directly but through her affiliated companies.

121.    As set forth above, Ms. Tilton purchased the Class A-3 Notes through Patriarch XV because it qualified with the A-3 Noteholder to submit a bid for the notes, something Ms. Tilton could not have done directly at the time.  Ms. Tilton contributed the funds from her personal investment vehicle to Patriarch XV to make the purchase.  She is the sole owner and registered taxpayer for Patriarch XV.

122.    Because of MBIA's misrepresentations, Patriarch XV now holds notes that are worth substantially less than they would be worth had MBIA honored its commitment to consent to a Zohar I maturity extension.  The Class A-3 Notes lost value because MBIA has refused to consent to an extension of Zohar I and now intends to use the leverage it obtained to negotiate a global restructuring that would cover MBIA's obligations without regard to the uninsured noteholders in Zohar I, Zohar II and Zohar III.

123.    Among other things, MBIA's actions have caused a maturity default to occur with respect to Zohar I which has not been waived.  Under the Zohar I Indenture, prior to default, the Class A-3 Notes are entitled to payments of principal and interest generated by the Zohar I collateral *pari pasu* with the Class A-1 Notes and Class A-2 Notes.  However, upon a default, the principal and interest under the Class A-3 Notes become subordinated to the Class A-2 Notes and Class A-3 Notes.  Thus, the Class A-3 Notes are currently not entitled to principal and interest payments until the Class A-1 and Class A-2 Notes now held by MBIA as subrogee are paid in full.  The change in subordination of the Class A-3 Notes, standing alone, has negatively impacted their value.

124.    Apart from the lost value of the Class A-3 Notes, MBIA's conduct has caused additional injury to Ms. Tilton.  Ms. Tilton funded and directed Patriarch XV's investment in the Class A-3 Notes.  Moreover, Ms. Tilton relied on MBIA's representation that a global

restructuring was in its best interest and that, if the A-3 Noteholder were removed, it would agree

to an extension as a first step towards a global restructuring.  Thus relying, Ms. Tilton spent her

own money to engage restructuring advisors to draw up proposals that MBIA always secretly

intended to reject.  She also spent countless hours meeting with MBIA, financial advisors,

lawyers, noteholders and potential investors in what is now clear was a futile effort to negotiate a

restructuring plan and raise capital to fund the plans.

125.    Similarly, had MBIA not hid its intentions, Ms. Tilton could have pursued

productive avenues toward an alternative restructuring, including buying out the A-1 Noteholder

at a discount and/or MBIA's position in Zohar I rather than that of the A-3 Noteholders.  Instead,

MBIA repeatedly misrepresented its intentions to Ms. Tilton, foreclosing the possibility of a

productive restructuring and ensuring that MBIA would have maximum bargaining power in

Zohar I *and* Zohar II upon a Zohar I default.

### FIRST CAUSE OF ACTION
**(Fraudulent Inducement)**

126.    Plaintiffs incorporate and re-allege each and every allegation in paragraphs 1 to

125 above as if fully set forth herein.

127.    MBIA repeatedly represented that the A-3 Noteholder was the "impediment" to

an extension of the Zohar I maturity date and that it would consent to extend the Zohar I maturity

date if the A-3 Noteholder were removed as an "impediment" to such an extension, as alleged

more fully above.

128.    MBIA's repeated representations were knowingly false when made.

129.    MBIA made these false representations to induce Plaintiffs to purchase the Class

A-3 Notes.  By causing Plaintiffs to purchase the Class A-3 Notes, MBIA avoided having to use

its own funds to remove the A-3 Noteholder.  MBIA wanted the A-3 Noteholder out of Zohar I

because MBIA viewed the A-3 Noteholder as an obstacle to a restructuring of Zohar I and Zohar II, which MBIA has now publicly stated is in its interest.  MBIA also gained leverage in negotiations with Patriarch concerning a restructuring of Zohar I and Zohar II by causing Patriarch to remove the A-3 Noteholder.

130.     In reliance on MBIA's false representations, Plaintiffs purchased the Class A-3 Notes for more than $103 million to remove the "impediment" to an extension identified by MBIA.

131.     Plaintiffs' reliance was justifiable.  Plaintiffs could not have learned, with reasonable diligence, that MBIA's repeated representations were false.

132.     Patriarch XV and Ms. Tilton suffered damages as a result of acts taken in reliance on MBIA's repeated misrepresentation, including, but not limited to the loss in the value of the Class A-3 Notes without the agreed-upon extension.

133.     Ms. Tilton also suffered damages as a result of acts taken in reliance on MBIA's repeated misrepresentation, including, but not limited to, costs incurred in the process of acquiring the Class A-3 Notes; the energy she diverted from other efforts to restructure or extend the Zohar I maturity and to running the CLOs and managing the Portfolio Companies.

134.     By reason of the foregoing, Plaintiffs have been damaged in an amount to be proven at trial, but not less than the monetary threshold of $100,000 required for jurisdiction in the Commercial Division in Westchester County.

## SECOND CAUSE OF ACTION
### (Promissory Fraud)

135.     Plaintiffs incorporate and re-allege each and every allegation in paragraphs 1 to 125 above as if fully set forth herein.

136.    MBIA represented that it would consent to extend the Zohar I maturity date if the A-3 Noteholder were removed as an "impediment" to such an extension, as alleged more fully above.

137.    This representation was knowingly false when made.

138.    MBIA made these false representations to induce Plaintiffs to purchase the Class A-3 Notes.  By causing Plaintiffs to purchase the Class A-3 Notes, MBIA avoided having to front its own funds to remove the A-3 Noteholder.  MBIA wanted the A-3 Noteholder out of Zohar I because MBIA viewed the A-3 Noteholder as an obstacle to a restructuring of Zohar I and Zohar II, which MBIA has now publicly stated is in its interest.  MBIA also gained leverage in negotiations with Patriarch concerning a restructuring of Zohar I and Zohar II by causing Patriarch to remove the A-3 Noteholder.

139.    In reliance on MBIA's false representations, Plaintiffs purchased the Class A-3 Notes for more than $103 million to remove the "impediment" to an extension identified by MBIA.

140.    Plaintiffs' reliance was justifiable. Plaintiffs could not have learned, with reasonable diligence, that MBIA's repeated representations were false.

141.    Patriarch XV and Ms. Tilton suffered damages as a result of acts taken in reliance on MBIA's repeated misrepresentation, including, but not limited to the loss in the value of the Class A-3 Notes without the agreed-upon extension.

142.    Ms. Tilton also suffered damages as a result of acts taken in reliance on MBIA's repeated misrepresentation, including, but not limited to, costs incurred in the process of acquiring the Class A-3 Notes; the energy she diverted from other efforts to restructure or extend the Zohar I maturity and to running the CLOs and managing the Portfolio Companies.

36

143.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be proven at trial, but not less than the monetary threshold of $100,000 required for jurisdiction in the Commercial Division in Westchester County.

### THIRD CAUSE OF ACTION
**(Breach of Contract)**

144.    Plaintiffs incorporate and re-allege each and every allegation in paragraphs 1 to 125 above as if fully set forth herein.

145.    MBIA entered into a binding contract with Plaintiffs under which it would consent to extend the Zohar I maturity date if Plaintiffs removed the "impediment" posed by the A-3 Noteholder, as alleged more fully above.

146.    MBIA breached this contract when, after Patriarch XV purchased the Class A-3 Notes, MBIA refused to agree to an extension absent additional concessions, such as a concurrent restructuring of both Zohar I and Zohar II and access to detailed and highly confidential information regarding the collateral of the Portfolio Companies.  MBIA did not bargain for these conditions at the time of contracting, nor did Plaintiffs agree to them.

147.    Plaintiffs suffered damages as a result of MBIA's breach, including, but not limited to, costs incurred in the process of acquiring the Class A-3 Notes; the energy diverted from other efforts to restructure or extend the Zohar I maturity and to running the CLOs and managing the Portfolio Companies; and the loss in the value of the Class A-3 Notes without the agreed-upon extension.

148.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be proven at trial, but not less than the monetary threshold of $100,000 required for jurisdiction in the Commercial Division in Westchester County.

## FOURTH CAUSE OF ACTION
(Promissory Estoppel)

149.    Plaintiffs incorporate and re-allege each and every allegation in paragraphs 1 to 125 above as if fully set forth herein.

150.    MBIA promised that it would consent to extend the Zohar I maturity date if the A-3 Noteholder were removed as an "impediment" to an extension, as alleged more fully above.

151.    It was foreseeable, at the time MBIA made its promise, that Ms. Tilton through Patriarch XV would act on MBIA's statements and would purchase the Class A-3 Notes with the expectation that the parties would subsequently execute an extension of the Zohar I maturity date.

152.    Plaintiffs acted in reliance on MBIA's false commitment when Plaintiffs purchased the Class A-3 Notes for more than $103 million.

153.    Plaintiffs' reliance was reasonable, particularly given their sophistication and the fact that they had a long-standing—and, historically, productive—relationship with MBIA.

154.    Plaintiffs suffered damages as a result of their reliance on MBIA's promise, including, but not limited to, costs incurred in the process of acquiring the Class A-3 Notes; the energy diverted from other efforts to restructure or extend the Zohar I maturity and to running the CLOs and managing the Portfolio Companies; and the loss in the value of the Class A-3 Notes without the agreed-upon extension.

155.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be proven at trial, but not less than the monetary threshold of $100,000 required for jurisdiction in the Commercial Division in Westchester County.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

a. An award of damages in favor of Plaintiffs against MBIA for all damages sustained as a result of its breach of contract, breach of promise and wrongdoing, in an amount to be proven at trial, including interest thereon;

b. An award of punitive damages for Plaintiffs' first and second causes of action;

c. An order declaring that MBIA fraudulently induced Plaintiffs to purchase the Class A-3 Notes by (i) repeatedly misrepresenting that the A-3 Noteholder was the "impediment" to an extension of the Zohar I maturity date; and (ii) falsely representing that it would consent to extend the Zohar I maturity date if the A-3 Noteholder were removed as an "impediment" to such an extension, even though MBIA had no intention of consenting to the extension;

d. An order declaring that MBIA breached its agreement to consent to extend the Zohar I maturity date if Plaintiffs removed the "impediment" posed by the A-3 Noteholder;

e. An order declaring that MBIA breached its promise to consent to extend the Zohar I maturity date if the A-3 Noteholder were removed as an "impediment" to an extension;

f. An award of reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

g. Any such other and further relief as the Court deems just and proper.

Dated: New York, New York
        January 15, 2016

     /s/ Jay B. Kasner

Jay B. Kasner
(jay.kasner@skadden.com)
Christopher P. Malloy
(christopher.malloy@skadden.com)
Scott D. Musoff
(scott.musoff@skadden.com)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
(212) 735-3000

Susan E. Brune
(sbrune@bruneandrichard.com)
BRUNE & RICHARD LLP
One Battery Park Plaza
New York, New York  10004
(212) 668-1900

*Attorneys for Plaintiffs*

40